**CONTINUATION OF APPLICATION FOR SEARCH WARRANT**

I, Jon Schafer, being duly sworn, depose and state that:

**SUMMARY OF PROBABLE CAUSE**

1.      I am a narcotics investigator, and I am seeking authorization to search a cell phone that was in the possession of Cameron NYGAARD when he was arrested pursuant to a federal warrant.

2.      On or about November 17, 2023, narcotics officers in the Grand Rapids area were investigating a suspected overdose, and the evidentiary trail led to the execution of a search warrant at NYGAARD's apartment. Police found cocaine, MDMA (ecstasy), and suspected fentanyl in his bedroom, along with over $9,000 in cash, packaging material, and a digital scale. Soon after the search, NYGAARD was charged locally with violations of Michigan law. Eventually, on February 13, 2024, a grand jury charged NYGAARD with possession of controlled substances with intent to distribute.

3.      In between the search of NYGAARD's apartment and his federal arrest, a United States Postal Inspector obtained a warrant that was destined for NYGAARD's apartment. It contained more than 400 counterfeit Xanax pills. Postal records showed that more than 50 packages with similar characteristics had been shipped to NYGAARD's address before that date.

4.      Although investigators intercepted the above pill package, they did not believe NYGAARD was continuing to deal drugs following the search of his apartment. This is because the package was likely ordered prior to the execution of the search

warrant. However, shortly before NYGAARD's federal arrest in February of 2024, investigators learned that another package with similar characteristics had been delivered to NYGAARD's apartment. This led investigators to believe NYGAARD had resumed drug trafficking while his local charges were pending.

5.     NYGAARD had a phone (**Device 2**) on his person when he was arrested pursuant to his federal warrant. A search of NYGAARD's previous phone (Device 1) uncovered drug trafficking text messages, as well as pictures and videos of suspected controlled substances.

6.     In view of these facts, which I describe in more detail below, I submit there is probable cause that I search of **Device 2** will uncover further evidence of drug trafficking in violation of Title 21, United States Code, §§ 841(a)(1) and 846.

## AFFIANT BACKGROUND

7.     I am a police officer with the Grand Rapids Police Department and a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA). I have been a law enforcement officer since 1998, and I have been a DEA TFO since 2015. During my time as a police officer and TFO, I have participated in multiple investigations of unlawful drug trafficking and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, reviews of taped conversations and drug records, and have participated in investigations that included the interception of wire and electronic communications. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs,

the laundering of drug proceeds, and the dialect, lingo, and coded language used by drug traffickers. As part of my duties as a DEA TFO, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 21, United States Code, Sections 841, 843, and 846. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances.

8.      I respectfully submit that there is probable cause to believe that Cameron NYGAARD has engaged in the distribution of controlled substances and that he has possessed controlled substances with intent to distribute, all in violation of 21 U.S.C § 841(a)(1). I further submit that there is probable cause to believe that evidence of this offense will be found on **Device 2**.

**PROBABLE CAUSE**

9.      The facts in this continuation come from my personal observations, my training and experience, and information obtained from other law enforcement officers, agents, and witnesses. This continuation is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

10.      **Device 2** is currently stored at the offices of the Drug Enforcement Administration in Grand Rapids, Michigan. The applied-for warrant would authorize

the forensic examination of **Device 2** for the purpose of identifying electronically stored data particularly described in Attachment B.

*An Overdose Investigation Uncovers Drugs in NYGAARD's Bedroom*

11.     Grand Rapids Police Department (GRPD) personnel responded to a report of a 16 year old boy, Minor 1, who was found deceased at his home on the morning of 11/17/2023.[1] Police spoke with Minor 1's girlfriend, who explained that Minor 1 had used a large quantity of cocaine, ecstasy, and "Molly" (also known as MDMA or ecstasy), Percocet pills, ketamine, and other drugs on 11/15/23 and 11/16/23. Specifically, his girlfriend observed Minor 1 snorting what she believed to be a Percocet pill at approximately 2300 hours on 11/16/23.

12.     Minor 1's girlfriend explained that all of the illegal street drugs that Minor 1 had been using were purchased through a subject she knew as "Kam Kam." She stated that Minor 1 had refused to buy drugs from anyone but "Kam Kam.," and that the suspected Percocet pill that Minor 1 had snorted on the evening of 11/16/23 was one of many purchased from "Kam Kam" on 11/15/23.

13.     Minor 1's girlfriend also told police that she often accompanied Minor 1 when he picked up drugs from "Kam Kam." She stated that "Kam Kam" lives in the Yorkland Creek Apartment Complex. She stated that anytime Minor 1 purchased drugs

---

[1] I know the identities of Minor 1 and his girlfriend, who is also a minor. I am withholding their names from this affidavit due to their ages, but I can disclose them to the Court upon request if the Court determines that the identity of either individual is necessary to a determination of probable cause.

from "Kam Kam," it was done in the parking lot of the Yorkland Creek Apartment Complex where "Kam Kam" lives. Minor 1's girlfriend explained that "Kam Kam" would exit his apartment and make the drug sales to Minor 1.

14.     A GRPD officer took control of Minor 1's cell phone as part of the investigation.  There were numerous text message exchanges between a contact saved as "Kam Kam" and Minor 1. The text conversations between the two parties were almost exclusively pertaining to the sale of narcotics, with "Kam Kam" selling various narcotics to Minor 1.

15.     For example, on the evening of Wednesday, 11/15/23 (the same date on which Minor 1's girlfriend said that Minor 1 had purchased the suspected Percocet pills), Minor 1 and "Kam Kam" had the following exchange:

> Minor 1:        n for the future Ket is the same price as M and ts?
>
> Kam Kam:     yessir
> Kam Kam:     across the board
> Kam Kam:     half g of raw right?
>
> Minor 1:        yessir
> Minor 1:        .2k
>
> Kam Kam:     got u
> Kam Kam:     heres what .2 looks like

16.     "Kam Kam" then sent a picture message of a white powdered substance on a digital scale. The above exchange, based on my training and experience, is a coded

yet apparent description of drug types and weights as well as prices, with "Kam Kam" offering the drugs for sale to Minor 1.

17.     The phone number listed under Minor 1's contact for "Kam Kam" was 616-279-6117. Open sources showed that this phone number was associated with a person named Cameron NYGAARD.

18.     A GRPD officer looked for other evidence that could confirm whether or not Cameron NYGAARD was "Kam Kam." That officer found a video that "Kam Kam" had sent to Minor 1 on Minor 1's phone. In the video, "Kam Kam" focused the camera on his own face and displayed bags of various narcotics. The officer compared the face in the video to a Michigan Secretary of State photograph for Cameron NYGAARD. The photo and the video depicted the same person.

19.     While the GRPD officer was still in control of Minor 1's phone, he noticed that "Kam Kam" (whom I'll refer to as NYGAARD going forward) was still messaging Minor 1 as if Minor 1 was still alive. The officer pretended to be Minor 1 and ordered Xanax and Ketamine from NYGAARD, who replied that he was out of Xanax but had Ketamine in stock. NYGAARD then agreed to sell 1 gram of Ketamine to the officer who was posing as "Minor 1."

20.     Still posing as Minor 1, the officer messaged NYGAARD and relayed that he would go to NYGAARD's apartment. NYGAARD responded by telling "Minor 1" to let him know when he was close.

21.      Meanwhile surveillance officers waited outside NYGAARD's apartment building. After the GRPD officer in control of Minor 1's phone sent NYGAARD a message indicating that he was close, the surveillance officers saw NYGAARD come out of his apartment building and get into a pickup truck in the parking lot outside. Police then took NYGAARD into custody. In a search incident to arrest, they found Device 1 on NYGAARD's person.

22.      Police obtained a search warrant for NYGAARD's apartment (3912 Yorkland Dr. NW, #4). Inside his bedroom, police found more than $9,000 in U.S. currency, a digital scale, another phone that was powered off, dozens of small plastic baggies, approximately 23 grams of cocaine, approximately 15 grams of MDMA, and approximately 14 grams of suspected fentanyl.

23.      A forensic chemist later confirmed that the cocaine and MDMA were, in fact, each of those substances. The lab has yet to test the suspected fentanyl.

*A Search of Device 1 Uncovers More Evidence of Drug Trafficking*

24.      Police also obtained a search warrant for Device 1. When they executed it, they found messages between NYGAARD and Minor 1 concerning drug trafficking. They also found digital videos of what appeared to be controlled substances, including DMT (dimethyltryptamine – a hallucinogenic drug), ketamine, and what appeared to be cocaine base. NYGAARD was overtly offering substances for sale. Here are some still images from the videos:









*USPIS Intercepts a Package of Counterfeit Xanax Destined for NYGAARD's Apartment.*

25.     On November 20, 2023, an agent with the U.S. Postal Inspection Service (USPIS) identified a Priority Mail parcel that was addressed to Guy Stephano at 3912 Yorkland Dr. NW, Apt 4, Comstock Park, Michigan.

> a.     This was Cameron NYGAARD's address, and November 20 was just three days after the search of his apartment.

> b.     There was no record of anyone named "Guy Stephano" living at 3912 Yorkland Dr. NW, Apt 4.

> c.     The package had been paid for using cryptocurrency. I know from my training and experience that drug traffickers often pay for drug shipments using cryptocurrency in order to make it more difficult for law enforcement to identify the person who has paid for package delivery. Payment via cryptocurrency is a particularly strong indicator that a package is likely to contain controlled substances.

> d.     The use of cryptocurrency is also associated with "dark web" drug purchases. The "dark web" is a term used to describe websites that are not indexed by conventional search engines. Thus, an internet user cannot find dark web pages using a typical search engine such as Google. Only users with special routing software, such as The Onion Router, can access "dark web" pages. Drug traffickers frequently use the "dark web" to buy and sell controlled substances.

e.      I know from my training and experience that the "dark web" can be accessed via smartphone.

26.      A drug detection canine alerted on the package, so the USPIS agent obtained a search warrant and opened up the box. Inside, there were 425 green, rectangular pills stamped with "S 90 3."

a.      I know from my training and experience that "S 90 3" is the pharmaceutical marker for Alprazolam, which is sold commercially as Xanax. I also know from my training and experience that alprazolam pills typically have the same rectangular or "bar" shape as the pills in the box.

27.      A lab tested the pills and determined that they did not contain alprazolam, as the "S 90 3" marker would indicate. Instead, the pills contained bromazolam. I know from my training and experience that bromazolam is a novel psychoactive substance (NPS) and "designer" benzodiazepine.[2] It is not a controlled substance, but it can cause death, especially when used in conjunction with other drugs.

28.      The USPIS reviewed package records for other parcels that had been delivered to 3912 Yorkland Dr., Apt 4. He learned that, since July of 2022, there had been

---

[2] For more information, consider "Bromazolam, Prevalence Surging Across the United States Driven in Part by Increasing Detections Alongside Fentanyl," available at https://www.ojp.gov/ncjrs/virtual-library/abstracts/bromazolam-prevalence-surging-across-united-states-driven-part

more than 50 other parcels that had been paid for using cryptocurrency and shipped to the same address. Here is some of the information he compiled:

| Label Date | Sender City | Sender State | Addressee Name | Addressee Address |
|---|---|---|---|---|
| 08/26/2022 14:08 | FOREST HILLS | NY | FOO STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 06/14/2022 03:10 | ALBUQUERQUE | NM | VALUED CUSTOMER | 3912 YORKLAND DR NW APT 4 |
| 09/19/2022 11:11 | brooklyn | NY | | 3912 YORKLAND DR NW APT 4 |
| 03/06/2023 04:17 | MILTON | GA | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 03/27/2023 00:18 | SAN BRUNO | CA | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 06/09/2023 09:39 | ANAHEIM | CA | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 08/22/2023 11:01 | BOISE | ID | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 06/13/2022 23:08 | TAMPA | FL | FOO STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 09/28/2022 13:08 | REGO PARK | NY | FOO STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 07/09/2023 23:29 | MOUNTAIN HOME | ID | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 07/25/2022 13:39 | SANTA BARBARA | CA | FOO STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 07/25/2022 13:39 | SANTA BARBARA | CA | FOO STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 12/28/2022 17:12 | EULESS | TX | FOO STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 04/10/2023 19:51 | SAN FRANCISCO | CA | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 08/10/2023 13:46 | DANIA BEACH | FL | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 06/18/2022 02:35 | ALBUQUERQUE | NM | PATIENT | 3912 YORKLAND DR NW APT 4 |
| 08/15/2022 12:08 | LOMPOC | CA | FOO STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 03/06/2023 04:17 | MILTON | GA | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 04/04/2023 13:15 | BROOKSVILLE | FL | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 07/06/2023 15:31 | NEW YORK | NY | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 06/28/2022 14:53 | ALBUQUERQUE | NM | CONTEST WINNER | 3912 YORKLAND DR NW APT 4 |
| 10/17/2022 17:08 | STATEN ISLAND | NY | FOO STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 12/28/2022 05:13 | LOS ANGELES | CA | FOO STEPHANO | 3912 YORKLAND DR NW APT 4 |

| | | | | |
|---|---|---|---|---|
| 06/27/2023 02:09 | OAKLAND | CA | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 01/17/2023 05:35 | GLENDALE | CA | FOO STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 07/13/2022 13:53 | SANTA MARIA | CA | FOO STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 01/09/2023 06:27 | TEMPLE CITY | CA | FOO STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 08/28/2023 13:00 | CORAL SPRINGS | FL | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 09/06/2022 14:11 | BROOKLYN | NY | FOO STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 12/26/2022 17:14 | Orlando | FL | | 3912 YORKLAND DR NW APT 4 |
| 03/13/2023 02:15 | HERCULES | CA | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 05/09/2023 10:18 | NEW YORK | NY | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 07/31/2023 01:00 | SAN FRANCISCO | CA | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 02/21/2023 04:18 | UNION CITY | CA | FOO STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 03/20/2023 00:19 | TRACY | CA | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 03/30/2023 02:36 | BRENTWOOD | CA | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 08/08/2023 12:45 | BROOMFIELD | CO | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 10/10/2023 02:15 | BRANDON | FL | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 03/01/2023 11:12 | SAN DIEGO | CA | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 08/08/2022 13:54 | SOLVANG | CA | CURRENT RESIDENT | 3912 YORKLAND DR NW APT 4 |
| 10/31/2022 13:25 | FOREST HILLS | NY | FOO STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 10/23/2023 12:21 | FORT COLLINS | CO | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 10/03/2022 13:11 | STATEN ISLAND | NY | FOO STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 01/08/2023 19:20 | ASHEVILLE | NC | FOO STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 04/11/2023 10:53 | NEW YORK | NY | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 10/02/2023 23:25 | CEDAR CITY | UT | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 09/26/2022 12:09 | REGO PARK | NY | FOO STEPHANO | 3912 YORKLAND DR NW |

| | | | | |
|---|---|---|---|---|
| 02/08/2023 04:12 | GLENDALE | CA | FOO STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 05/15/2023 01:21 | MARTINEZ | CA | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 11/13/2023 15:16 | Spartanburg | SC | | 3912 YORKLAND DR NW APT 4 |
| 11/15/2023 00:47 | LAKELAND | FL | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 11/13/2023 15:30 | PICKENS | SC | | 3912 YORKLAND DR NW APT 4 |
| 08/18/2023 12:00 | CORAL SPRINGS | FL | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 10/16/2023 20:20 | SPARTANBURG | SC | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 10/25/2023 20:05 | SPARTANBURG | SC | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |
| 11/14/2023 16:56 | JOHNSTOWN | CO | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |

*USPIS Discovers Another Suspicious Package Delivered to NYGAARD*

29.     After the USPIS agent collected the above data, NYGAARD remained on bond while his local (i.e., non-federal) charges were pending.

30.     In February of 2024, investigators learned that another suspicious package had been delivered to 3912 Yorkland Dr. NW, Apt 4. While investigators did not intercept the package before it was delivered in January of 2024, records showed that, as with the above packages, it was paid for with cryptocurrency. The package was addressed to "Guy Stephano" and shipped from Santa Ana California:

| | | | | |
|---|---|---|---|---|
| 01/23/2024 20:05 | SANTA ANA | CA | GUY STEPHANO | 3912 YORKLAND DR NW APT 4 |

31.     "Guy Stephano" is the same fake name that was listed as the addressee on the package that contained counterfeit Xanax.

32.     From my training and experience, I know that this parcel was assigned a tracking number because it was sent via priority mail. Also from my training and experience, I know that drug traffickers who use the mail to send and receive controlled substances often maintain tracking number information on their mobile devices, and that recovery of this information can establish a link between a parcel and a specific drug trafficker.

33.     In view of the drugs found in NYGAARD's room, the evidence from Device 1, the contents of the intercepted package, and the similarities in addressee and payment method between the intercepted package and the package delivered in January of 2024, I suspect that the January package was contained distribution quantities of more controlled substances and/or counterfeit controlled substances.

34.     On or about February 13, 2024, a grand jury returned an indictment accusing NYGAARD of possession with intent to distribute controlled substances. The offense alleged corresponded to the controlled substances that police found in his bedroom on or about November 17, 2023.

*Police Recover Device 2 from Nygaard's Person*

35.     The district court issued an arrest warrant. On or about February 22, 2024, police arrested NYGAARD pursuant to the warrant. In a search incident to arrest, investigators discovered **Device 2** was on NYGAARD's person.

36.     **Device 2** is a black iPhone in a black case.

*Information About Drug Traffickers and Cell Phones*

37.     Based on my training and experience, I know that drug traffickers often maintain and use multiple phones, and that each device often contains distinct evidence of drug trafficking. For example, some traffickers use one phone to communicate with their customer base and a different phone to communicate with their sources of supply.

38.     Based on my training and experience, I know that electronic devices such as the **Subject Device(s)**, can be used to store electronic information for long periods of time, including years. Even if a drug trafficker is being cautious of law enforcement detection and deleting the substance of communications, significant data may still remain on the phone, such as call logs, contact information, photographs, wireless internet connections (which can reveal location information), and other location information. Furthermore, I know that drug traffickers carry and utilize multiple phones to conduct criminal drug transactions.

39.     Further, based upon my training, experience, and participation in drug investigations and financial investigations relating to drug investigations, I am aware of the following:

          a.     Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in their devices;

          b.     Drug traffickers sometimes use electronic messaging or messaging apps, in addition to MMS, SMS text messages, and voice call, to

communicate with suppliers, purchasers, and others involved in drug trafficking on their devices;

b.     Drug traffickers often take pictures or videos of their drug trafficking associates, drugs, money and/or firearms, which they store on their devices;

c.     That drug traffickers often maintain, on hand, large amounts of currency in order to maintain and finance their on-going narcotics business;

d.     Global Position System (GPS) data on phones may show the location of a drug trafficker at a given time, which may provide corroborating evidence of a drug delivery or other instance of drug trafficking;

e.     User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the device is being used by a drug trafficker and can provide other useful evidence to the drug investigation;

f.     Drug traffickers often use the internet to look up various information to support their drug trafficking activities;

g.     That drug traffickers often have unexplained wealth and assets as they do not have a job, nor do they report income on their state or federal tax returns.  Subjects often use cash, money orders, and cashier's checks, and prepaid debit cards as a way of purchasing items as a way to disguise where the funds are ultimately coming

from.  Subjects will place assets in the names of nominees, which are often friends and family members in an attempt to hide the true ownership of the assets. It is common for drug traffickers to maintain books, records, receipts, notes, ledgers, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances.  That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them, including their devices;

h.   That it is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds.  This evidence includes currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box receipts or keys, records concerning storage lockers and money wrappers.  These and other items are maintained by the drug traffickers within their residences, businesses, or other locations over which they maintain dominion and control.

i.      That when drug traffickers amass large proceeds from the sale of controlled substances that the drug traffickers attempt to legitimize these profits through money laundering activities.  To accomplish these goals, drug traffickers utilize but are not limited to, domestic and international banks and their attendant services, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, storage lockers, safe deposit boxes and otherwise legitimate businesses that generate large quantities of currency.

j.      That the sale of controlled substances generates large quantities of United States currency in small denominations (commonly referred to as "street money").

k.      That it is common for drug traffickers to separate their "street money" by denomination and organize this currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting.

l.      That the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried, and concealed may establish probable cause that there is a substantial connection between the questionable currency and drug transactions.

m.      That drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies.   The "source" of their income reported on tax returns can be falsely stated, misleading or generic in terms.  Retained copies of these returns are commonly kept by the traffickers in their residences and businesses.

n.      That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

o.      That drug traffickers frequently receive their supply of drugs through packages sent by U.S. Mail or third-party delivery service.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

40.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device(s) were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device(s) because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.      Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

41.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with

the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

42. *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

43.    I submit there is probable cause that a search of **Device 2** will uncover additional evidence of illegal distribution of controlled substances and possession of controlled substances with intent to distribute, contrary to 21 U.S.C. § 841(a)(1). I submit there is also probable cause that a search of **Device 2** will uncover evidence of the use of an interstate communications facility in furtherance of a controlled substance offense, contrary to 21 U.S.C. § 843(b). Accordingly, I request a warrant authorizing the examination of the **Device 2**, described in Attachment A, to seek the items described in Attachment B.